Filed 5/10/19

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TYRONE JOHNSON,<br><br>        Defendant and Appellant. | A149394<br><br>(San Francisco City & County<br>Super. Ct. No. 225044) |

A jury convicted defendant Tyrone Johnson of rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3)),[1] and the trial court sentenced him to eight years in prison. On appeal, he contends (1) the court committed several instructional errors, (2) the statute defining the crime of rape of an intoxicated person is unconstitutionally vague and improperly permits conviction without a finding of intent or criminal negligence, (3) the prosecutor engaged in misconduct, (4) the court erred by admitting prejudicial evidence, (5) his trial counsel was ineffective, and (6) the court erred by imposing a restitution fine and certain fees at sentencing without determining whether Johnson had the ability to pay them.

In the unpublished portion of this opinion, we reject Johnson's challenges to his conviction. In the published portion of the opinion, we reject his challenge to the imposition of fines and fees at sentencing. Accordingly, we affirm the judgment.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.B and parts II.A through II.H.

[1] Undesignated statutory references are to the Penal Code.

1

# I. BACKGROUND

## A.     The Charges

An information charged Johnson with (1) kidnapping to commit another crime (§ 209, subd. (b)(1)) (count one), (2) forcible rape (§ 261, subd. (a)(2)) (count two), and (3) rape of an intoxicated person (§ 261, subd. (a)(3)) (count three).  As to count two, the information included special allegations that Johnson kidnapped the rape victim (§ 667.61, subd. (e)(1)) and that the kidnapping substantially increased the risk of harm to the victim beyond the level inherent in the underlying rape (§ 667.61, subd. (d)(2)).[2]

## B.     The Evidence Presented at Trial

### 1.     Annie's Recollection of Events

On Friday, August 28, 2015, 23-year-old Annie Y. returned to her residence in San Francisco after an ordinary day at work.  Upon arriving home, she began getting ready for a friend's birthday celebration later that night.  Three female friends arrived at Annie's home at about 11:00 p.m. and began taking shots of vodka.  Annie took two or three shots of vodka with them.  Annie, who was about five feet, five inches tall and weighed about 128 pounds, felt a little buzzed but not drunk at the time.

At around 11:40 p.m., Annie left with her three friends via Lyft or Uber to Ruby Skye, a nightclub about a five- to seven-minute drive away from her home.  By then, the club was fairly busy and the birthday host was already at a table on the second floor.  Annie took a shot with the birthday girl upon arriving and continued to take shots until leaving the club at around 1:40 a.m., taking a total of about five shots of cognac.  Eventually, she started to feel drunk.  She could not find her friends in the club and decided to walk home.

Annie had no memory of what happened between when she left the club and later that early morning, when she found herself at a Best Western hotel and in need of a place to relieve herself.  Some people let her into a single-occupancy restroom, and the door closed behind her.  She collapsed on the floor of the bathroom before arriving at the

---

[2] The trial court dismissed similar allegations that were included in the information as to count three.

2

toilet, however, and soiled her pants. She felt like she was about to pass out. She heard pounding on the bathroom door and male voices demanding that she open the door. From where she was sitting on the floor, she unlocked the door. Someone pulled her up by the upper arms, but she could not remember who it was.

Annie recalled seeing two people who appeared to be in uniform, and she assumed they were hotel employees. Annie pleaded with them, apologizing and saying, " 'Please help me,' " and, " 'Just give me two hours.' " She also recalled stating, " 'I don't know this guy. I think he's going to kill me,' " referring to a man who was with her at the time, later identified as Johnson. She recalled being in the lobby area of the Best Western with her shoes off and, shortly after, being right outside the Best Western. She was sitting on the sidewalk and was drifting in and out of consciousness. Johnson was attempting to hail a taxi. She remembered wanting to go home, and she recalled providing her address in an attempt to get home.

Annie next remembered lying on a bed, with no idea where she was or how she had gotten there. It was still dark outside. Someone took her pants and underwear off without saying a word. She felt nauseous, very intoxicated, and extremely weak. She vaguely recalled Johnson's voice making slurping noises and " 'mmmmmm' " noises as though he was performing oral sex on her. The room did not seem to stay in place, and she blacked out again.

Annie next remembered feeling a lot of pain as Johnson, completely naked, lay on top of her and put his penis in and out of her vagina. Annie was clothed only in a bra and a tank top. She repeatedly said, " 'Ow. This hurts. Please stop,' " and, " 'You're hurting me.' " She took his penis out with her hands several times and placed her hands in front of her vaginal opening, but Johnson moved her hands out of the way and put his penis back inside. Johnson responded, " 'Please, baby. Don't stop. This feels so good. You're so beautiful,' " and, " 'You're so cute.' " Finding her legs pinned down by Johnson's body, Annie attempted to push away Johnson's face with her hands but found herself too weak to do so. Annie was not sexually active, and she had never previously felt this " 'very, very sharp pain in the entrance of [her] vagina.' " She did not know how

3

long Johnson inserted his penis in and out of her vagina, as she blacked out before he stopped.

Annie next remembered waking up after it was daylight, lying in the same position but with a blanket on top of her.  It was about 11:07 a.m.  Annie felt disoriented.  She did not know where she was.  She had a headache, her body ached, and her vagina was very sore.  She was wearing only a bra and tank top, and Johnson was sleeping next to her completely naked.  She looked around and saw she was in a very small room with dingy walls with graffiti on them.  Annie cursed and was disgusted by where she was.  She looked around for her possessions—her phone, watch, credit card, ID, and money.  Johnson pointed to her clutch, which still had everything inside.  Johnson also handed Annie her FitBit watch when she asked about it.  Annie was able to find everything but her keys.  She looked at Johnson in shock, and he got out of bed with a smirk and asked, " 'Was I too big for you?' "  Annie felt stupid for getting separated from her friends and being in a stranger's room where he had sex with her while she was defenseless.

Annie then recalled that Johnson did not have a condom on the previous night. " 'Did you pull out?' " she asked, to which Johnson replied, " 'Of course I did.' "  Annie also asked if Johnson had any sexually transmitted diseases, to which Johnson responded, " 'Do I look like the type who would?' "  Annie went down the hall to the restroom but returned without using it because it was dirty and had no toilet paper.  She returned to the room and asked Johnson where her pants and underwear were.  He knew where they were and pointed to the top of the wardrobe.  She saw a bloody stain on the bed close to the side where she had slept and asked, " 'What's that?' "  Johnson said he did not know and that he should get the stain out.  Annie thought it might have been blood from her broken hymen but, not wanting Johnson to know, she said, " '[O]h, I must just be on my period.' "  Annie also tried to find out Johnson's identity by asking his name, age, and number in order to piece together later what happened that night.  They exchanged names and numbers. Johnson took out his cell phone and showed Annie pictures of his son, who was about two years old, and an African-American woman in her thirties, remarking, " 'This is my girl.' "

Annie put her still damp pants and underwear back on but had no shoes. Johnson led her down a small elevator and they walked out of the building—the Henry Hotel, which was close to where Annie lived. Annie called a Lyft to take her home and, now out in the open and wanting Johnson to understand what he had done, she told him, " 'Oh, by the way, you took my V-card,' " referring to her virginity.

### 2. Other Evidence of the Incident

In addition to Annie's testimony, the prosecution presented testimony from a security guard at the Best Western and another hotel employee there, both of whom testified Annie was very intoxicated. She had difficulty standing and walking and had slurred speech, and she vomited outside the Best Western. Annie said she did not want to go with Johnson, but the employees assumed, based in part on statements Johnson made (such as calling Annie pet names like "baby" and "doll," and saying Annie was "[his] girl"), that the two were a couple.

The prosecution presented surveillance video footage of Annie outside the Best Western. The prosecution also presented video footage from the Henry Hotel, which apparently showed Annie in a walker or wheelchair and being pushed by Johnson and a friend into the hotel.

### 3. Subsequent Events

After the incident, Annie struggled with how to confront what had happened and whether to report it to police. On Saturday, August 29, 2015, she confided in a friend, who assured her it was not her fault. Late that night, Annie found information on the Internet about services provided by San Francisco General Hospital. On Sunday, August 30, 2015, she went to the hospital, where a nurse practitioner conducted a sexual assault examination. Annie was very sore and tender. There was dried blood on the inside of Annie's labia, but with only minimum maneuvering the opening began to bleed again, indicating that the wound was fresh. The examination revealed a complete tearing of Annie's hymen. Annie cried throughout the examination and repeated that Johnson "stole [her] V-card."

5

Also in the first days after the incident, Annie exchanged text messages with Johnson. She did this in an effort to understand better what had happened. At 11:21 a.m. on Saturday, August 29, 2015, Annie texted Johnson using his nickname, " 'Tyrone, Skittles, Annie, I fucking lost my keys. Can you check if they're at your place?' " When he responded that he checked and confirmed that the keys were not there, Annie stopped responding to his texts until the afternoon. Johnson continued to text, " 'Callme layer when ur done K' " and " 'Are u okay.' "

Johnson continued to text through the afternoon, although Annie had not responded. He wrote: " 'Please TeX back I'm really thinking about u and what u said to me when u left I now how u feel and care about how feel I'm a good person if u give me a chance to show u Annie city TeX me back please u don't have to callme just TeX me I would like to talk and get to no each chether.' " He also wrote: " 'Are u mad at that's why u not responding I won't bother u no more godbless I'm sorry if I hert you in mining tips of way place forgive I just want to help u that was My tention. [¶] I didn't mean no harm I really like u and want to be u first that all I can think of right now.' "

Annie eventually responded in the afternoon by texting, " 'Lol I'm not mad. Honestly I'm just disappointed in myself. Also, I left my house without my phone that's why I want responding.' " Johnson replied, " 'Don't be disappointed thank god that u was with .me k and if I can see u later.' " Annie thought meeting with Johnson might help her learn what happened that night and give her closure, so she replied, " 'Sure man. We can grab coffee or go for lunch some day.' " Johnson responded, " 'That work. And u pick the day and time and I will b there.' " Annie replied, " 'Okie dokes.' " Johnson continued to text that night, stating, " 'I miss u a lot from yesterday,' " and, " 'Ur so funny and cute when ur drunk lol.' " Annie did not respond.

On Sunday night (August 30, 3015), Johnson began texting again, stating, " 'Hi have a blessday,' " and, " 'Hi again have a blessday.' " By this time, Annie's sexual assault examination had been conducted, and she had seen the visual tears on her vagina and the bleeding. She replied, " 'You really hurt me. And you really shouldn't have done what you did.' " Johnson replied, " 'I'm sorry if I hurt u please forgive me I really

6

like u.' " Annie asked, " 'How old are u,' " to which Johnson replied, " 'How old are u.' " This led to the following exchange: Annie responded, " 'I already told you but you never told me.' " Johnson replied, " 'No u didn't tell me u was playing like u was underage that's all u said,' " and followed with, " 'I'm 32.' " Annie replied, " 'Oh okay.' "

At this point, Annie stopped responding to most of Johnson's texts. Johnson also called Annie several times, but she did not return his calls. On Tuesday morning (September 1, 2015), she texted, " 'Do you feel bad,' " thinking she would decide whether to report the rape based on whether Johnson felt sorry for what he had done. Johnson replied later that afternoon, " 'No because u grab my head when I was making love to u so u was in joying it to.' " Annie felt very offended by this response, which solidified her resolve to file a police report.

On Thursday afternoon (September 3, 2015), Annie called a rape hotline to try to get advice on what filing a police report would entail. (She had tried calling the hotline a few days earlier but everyone there was busy and she was unable to speak to anyone.) Annie felt concerned that filing a police report and initiating the criminal process would be too much for her when the ordinary demands of life—adjusting to a new city, meeting expectations at a demanding job, and trying to live a normal life—seemed daunting. But after talking with someone on the hotline, Annie called law enforcement that evening and reported to two officers that Johnson had sex with her without consent. After checking with the police on whether she could block Johnson's number or whether they needed to collect more evidence, Annie blocked Johnson's number on her phone.

Several days later, on September 15, 2015, Annie met with Sergeant Nathaniel Yuen, who became the assigned investigator on the case. At Sergeant Yuen's direction, Annie unblocked Johnson's number and texted him (and tried calling him once) in an effort to obtain more information in connection with the police investigation. At 12:19 p.m. that day, Annie texted, " 'Hey are you free to chat.' " Johnson replied, " 'Yes bout five are. six.' " Annie responded at 4:05 p.m., " 'I've been thinking about you and that night,' " and then at 4:12 p.m., " 'I feel like a lot happened. Do you remember how

7

drunk I was.' " Johnson replied, " 'I was a little drunk my self u was drunker then me yes I remember.' "

Later, on Thursday, September 17, Johnson texted, " 'Like that you must not be a vergin you got ur fhilone off I'm ur first I Hope,' " which seemed incomprehensible to Annie. Then, at 4:35 a.m. the next day, Johnson texted, " 'U b playing mind games with me all u got to say is stop calling are texting me and I will u b tripping saying one thing then change up I'm not calling u no more I'm done trying to understand u it's all good god noes were my hart is I tried can get my mind straight with u calling me every blue moon godbless.' " The last either of them texted was on the following Monday, when Annie texted, " 'Hey.' "

### 4.      The Defense Case

Johnson's sisters, Felecia Johnson (Felecia) and Twonda Johnson, testified as character witnesses and stated Johnson is an honest person. They acknowledged he has a criminal record, but they said he is the type of person who will admit when he has done something wrong. Felecia also testified that, on Sunday, August 30, 2015, she was with Johnson, and he received a phone call from Annie. Sergeant Yuen testified that, when he reviewed Annie's call log history at his meeting with her on September 15, it showed no calls from Annie to Johnson.

Johnson testified that, on the evening of Friday, August 28, 2015, he was with his one-year-old son around the intersection of Market and Seventh Streets enjoying an outdoor event. After an hour or two, the mother of Johnson's son came and picked up the child. Johnson stayed in the area, and after the sun went down, he began drinking a fifth of Grand Marnier and a fifth of Hennessey with a friend. After drinking the fifths, he went with his friend toward the intersection of Turk and Taylor to get more alcohol. He saw Annie walking down the street from the direction of the Ruby Skye club. When they made eye contact, Johnson asked Annie her name, which she gave. Johnson replied, " 'My name is Skittles.' " Annie then asked for his real name and, when he gave it, she grabbed him and his friend by the hand and asked, " 'Why don't you all walk with me,' "

as they walked toward Market Street.  Johnson could tell that Annie had been drinking by the way she was walking.

Johnson testified that he, Annie, and his friend chatted and joked as they walked a few blocks to Sixth and Market.  They stopped at a bus stop to rest, and Annie sat on Johnson's lap instead of sitting on a bus stop seat.  Johnson's friend left, and Johnson and Annie sat for five to 10 minutes.  Annie then suggested going to her place and said she lived on "Fifth."  Rather than going toward Fifth, however, Johnson and Annie walked toward Seventh and Mission.  Annie tried to put her keys into a gate in an alley, but the gate did not open.  She then said she needed to use the bathroom badly.

At Johnson's suggestion, they walked to the nearby Best Western so Annie could use the restroom.  While Annie was in the restroom, Johnson waited outside and smoked a cigarette.  He checked on her once and she responded that she was okay.  When he returned to the bathroom a second time, he could barely hear her.  Johnson told personnel at the front desk that he had a girlfriend in the restroom and needed help checking on her because he felt something was wrong.

The hotel staff tried to explain to Annie how to open the door, but Johnson did not recall how long it took for Annie to comply.  When the door opened, he saw Annie on the floor in a puddle of water or urine.  She had vomit on her.  Johnson helped clean her up and, at the hotel security guard's direction, he picked Annie up to move her from the bathroom toward the front door.  Once at the front of the hotel, Annie said she felt like throwing up again and Johnson put her down.  Annie threw up in a nearby garbage can.  Annie then walked back to the bathroom to get something and came back outside quickly.  Annie's attitude changed after leaving the bathroom, and she began saying negative things about how she did not want to go with Johnson.

Johnson began to leave, but the security guard stopped him and told him not to leave Annie when she was drunk.  Johnson returned, and a cab came around that time.  The driver refused to serve Annie because " '[s]he is throwing up too much' " and left with Johnson's broken belt and Annie's shoes in the cab.  Annie apologized for what she

said previously and said, " 'Let's just get out of here. Let's just go. Let's just walk.' " Annie stated, " 'I'll just go with you to your room or wherever your place is at.' "

Johnson testified that Annie, now barefoot, was "walking fine" and grabbed his hand again. Annie did not seem as drunk as when she was in the bathroom at the Best Western. But Johnson also testified Annie had to sit down in an alley for a long time because her head hurt very badly. At one point, Annie asked for water, and Johnson gave her a bottled water that the Best Western staff had provided for her earlier. Johnson told Annie he was going to rent a room at the Henry Hotel and asked if she wanted to stay with him for the night. Annie responded that she did. Johnson then went to get a walker or wheelchair for Annie because she was barefoot. Johnson saw his friend Big Chuck pass by, and told him, " 'I need some help with my girlfriend,' " and asked him for a walker. Big Chuck came back with a walker, and Annie got up and sat on the walker with some assistance. Big Chuck pushed her into the Henry Hotel.

Johnson testified that, once inside the room at the Henry Hotel, Annie got up from the walker and lay down on the bed. Johnson then left with Big Chuck and walked him to the elevator where he gave Big Chuck seven dollars for his assistance with the walker. When he returned to the room, Annie asked him for a bucket because she needed to throw up again. She threw up a little bit. Annie then seemed less drunk than she had previously. Sometime before Annie got into bed, Johnson asked her to take her soiled jeans off.

Johnson testified that Annie lay with her pants off but in her panties, and after a while Johnson took off his pants as well because he figured he might as well relax too. Johnson watched television for a while. Annie then put her hands around his head and pushed it toward her vagina, which prompted him to give her oral sex. Annie was awake, was moving Johnson's head around, and was moaning as if what Johnson was doing felt good. Annie then pulled her panties down further and removed them with Johnson's help. Johnson removed his boxers, and then he placed his penis into Annie's vagina. Johnson testified that Annie was awake with her eyes open and never told him to stop or that he was hurting her. They were moaning like they were "both into it." Johnson

10

pulled his penis out of Annie's vagina to ejaculate. Annie was still awake and turned to her side. Then they both fell asleep.

Johnson testified that, when they woke up the next morning, Annie asked where they were, and he replied that they were at the Henry Hotel. Annie joked with him by asking how old he was and teasing him by claiming she was 16. She then said she had to go to a party, asked for her things, and asked him to walk her to her Uber. While still in the room, Annie said she was mad at herself and disappointed in herself for the way things happened, which prompted Johnson to ask if she was mad at him. Annie stated she was only mad at herself and asked for the bathroom. When she returned, she said she had to leave and asked him to take her to the cab. Once in the car, she opened the door and told him, " 'You took my V-Card,' " which he did not understand until later to mean that she had been a virgin. Annie had not previously said she was a virgin.

Johnson said Annie texted him to check whether she had left her keys in the room and that he texted to check on her later that day. He wanted to get to know her better and tried to keep in touch with her with texts and calls.

## C.    The Verdict and Sentence

At the conclusion of the trial, the jury found Johnson guilty of rape of an intoxicated person (count three). The jury found Johnson not guilty of the kidnapping and forcible rape charges in counts one and two and found the kidnapping special allegations were not true. For count one, the jury was unable to reach a verdict as to the lesser included offenses of simple kidnapping (§ 207) and false imprisonment (§ 236).

The trial court sentenced Johnson to the upper term of eight years in prison (§ 264, subd. (a)). Johnson appealed.

## II.  DISCUSSION

## A.    The Instruction on Rape of an Intoxicated Person

The trial court, using a version of CALCRIM No. 1002, instructed the jury the crime of rape of an intoxicated person has the following elements: (1) the defendant had sexual intercourse with a woman; (2) the defendant and the woman were not married; (3) the effects of an intoxicating substance prevented the woman from resisting; and

11

(4) "[t]he defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting." (See § 261, subd. (a)(3) ["Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] . . . [¶] (3) [w]here [the] person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused."].) The court further instructed that an intoxicating substance prevents resistance when it prevents the giving of legal consent—that is, "consent given freely and voluntarily by someone who knows the nature of the act involved."

At Johnson's request, the court included a bracketed, optional portion of CALCRIM No. 1002, which states: "The defendant is not guilty of this crime if *he actually and reasonably believed* that the woman was capable of consenting to sexual intercourse, even if that belief was wrong. The People have the burden of proving beyond a reasonable doubt that the defendant did not *actually and reasonably believe* that the woman was capable of consenting. If the People have not met this burden, you must find the defendant not guilty." (Italics added.)

On appeal, Johnson argues the optional portion of the instruction, which addresses a defendant's reasonable belief in the capacity to consent (and which Johnson refers to as "the defense of mistake of fact"), was legally incorrect. He contends that a defendant's belief in the capacity to consent, whether or not that belief was reasonable, is a defense to the charged crime. He relies on section 26, which refers to a defendant's "mistake of fact" as a circumstance preventing criminal liability but does not expressly state the mistake must be reasonable. (See § 26 ["All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Three—Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."].)

We reject this argument. The "defense" described in the optional portion of CALCRIM No. 1002—the defendant actually and reasonably believed the victim was capable of giving legal consent—is "merely the negation of an element of the offense" of

12

rape of an intoxicated person.[3] (*Lujano, supra,* 15 Cal.App.5th at p. 195 [discussing analogous elements and instruction pertaining to sodomy of an intoxicated person, § 286, subd. (i)].)  Specifically, the optional language in CALCRIM No. 1002 restates the fourth element of the offense listed earlier in the instruction:  "[I]nstead of saying that the defendant can be guilty only if he *knew or reasonably should have known* that the victim was prevented from resisting, the optional language says that the defendant is not guilty if he *actually and reasonably believed* that the victim was capable of consenting." (*Lujano*, *supra*, 15 Cal.App.5th at p. 193, italics added.)  Both portions of the instruction accurately reflect the statutory language specifying that rape occurs when a woman is prevented from resisting by intoxicants "and this condition *was known, or reasonably should have been known* by the accused."  (§ 261, subd. (a)(3), italics added.)

 We are not persuaded by Johnson's suggestion that the general language of section 26 overrides this legislative scheme and requires that, in every case (and regardless of the mental state specified for the statute at issue), a defendant who makes an unreasonable mistake of fact has a defense to liability.[4]  As Johnson acknowledges, when a mistake of fact is asserted as a defense to a rape charge (as in the case of the *Mayberry* affirmative defense to forcible rape, which is based on § 26), our Supreme Court has expressly required that the mistake be reasonable.  (*People v. Williams* (1992) 4 Cal.4th 354, 360– 361 ["regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society

---

[3] This contrasts with the "*Mayberry* defense" to a charge of forcible rape, i.e., "that the defendant actually and reasonably but mistakenly believed that the victim consented." (*People v. Lujano* (2017) 15 Cal.App.5th 187, 194 (*Lujano*); see *People v. Mayberry* (1975) 15 Cal.3d 143, 154–155.)  "[B]ecause the victim's lack of consent is an element of [forcible rape] but the defendant's *belief* in the absence of consent is *not* an element, the *Mayberry* defense is an affirmative defense, not merely the negation of an element of the offense." (*Lujano*, *supra*, 15 Cal.App.5th at p. 194.)

[4] In part II.C below, we reject Johnson's argument that the mental state specified in section 261, subdivision (a)(3) runs afoul of section 20's requirement that "[i]n every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."

13

will tolerate as reasonable" for the *Mayberry* defense to apply].)  To the extent Johnson suggests that support for a contrary rule can be gleaned from legal commentary or from language in judicial opinions addressing other issues (e.g., *People v. Elmore* (2014) 59 Cal.4th 121, 136–137 [discussing unreasonable self-defense doctrine applicable in homicide cases]), that argument provides no basis for reversal here.  As we noted in a prior case involving the *Mayberry* defense to rape, "[w]e of course are bound to follow the California Supreme Court's test for [the] mistake of fact defense."  (*People v. Castillo* (1987) 193 Cal.App.3d 119, 124, fn. 7.)

## B.     Vagueness of Section 261, Subdivision (a)(3)

Johnson contends the "reasonably should have been known" language in section 261, subdivision (a)(3) is unconstitutionally vague.  (See § 261, subd. (a)(3) [rape occurs when a "person is prevented from resisting by any intoxicating or anesthetic substance . . . and this condition was known, or reasonably should have been known by the accused"].)  Johnson argues specifically that "it is impossible to determine when a person 'reasonably should have known' that another is 'prevented from resisting by any intoxicating or anesthetic substance.' "  We reject this argument.

The due process clauses of the federal and state constitutions require " 'a reasonable degree of certainty in legislation, especially in the criminal law . . . .' [Citation.]  '[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " (*People v. Heitzman* (1994) 9 Cal.4th 189, 199.)  In addressing a vagueness challenge, we apply a presumption in favor of the constitutionality of statutes.  (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 568.)  A statute " ' "cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' " (*Ibid.*)

In *People v. Linwood* (2003) 105 Cal.App.4th 59, 66 (*Linwood*), our colleagues in Division One of the Fourth Appellate District rejected the claim that the "reasonably should have been known" language in section 261, subdivision (a)(3) is unconstitutionally vague.  The *Linwood* court explained:  "The concept of reasonableness

14

in criminal statutes is not new. [Citation.] ' "There is no formula for the determination of reasonableness." Yet standards of this kind are not impermissibly vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' [Citation.] 'Reasonableness as the standard of an act, which can be determined objectively under the circumstances, is a constitutionally valid standard of law.' " (*Linwood, supra,* 105 Cal.App.4th at p. 67.) The use of a reasonableness standard "does not make a statute uncertain; it requires either actual or constructive knowledge of the risk. [Citation.] Imputed knowledge of the risk is tested on an objective basis: ' "[I]f a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' " (*Ibid.*)

We agree with the *Linwood* court and hold section 261, subdivision (a)(3) is not unconstitutionally vague. Johnson notes that the defendant in *Linwood* apparently argued primarily that section 261, subdivision (a)(3) did not provide adequate notice for an individual to avoid liability under the statute. (*Linwood, supra,* 105 Cal.App.4th at p. 66.) Johnson argues *Linwood* is not dispositive as to whether the statute satisfies the other concern underlying constitutional vagueness doctrine, i.e., the need to provide an adequate guide for official decisionmakers and thus avoid arbitrary and discriminatory enforcement. (See *Williams v. Garcetti, supra,* 5 Cal.4th at p. 567 ["a criminal statute must ' "be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt" ' "].)

But the *Linwood* court did address this second vagueness concern in part, concluding the statute provides a definite enough standard for a jury to determine guilt. (*Linwood*, *supra*, 105 Cal.App.4th at p. 68.) Specifically, the *Linwood* court held that a jury applying the statute *can* "determine whether a defendant reasonably should have known that a person's level of intoxication was such as to prevent him or her from resisting an act of sexual intercourse[.]" (*Ibid.*) The court relied on *People v. Rodriguez* (1986) 42 Cal.3d 730, in which our Supreme Court upheld a statute (§ 190.2,

15

subd. (a)(7)) providing for a possible death penalty if a defendant in a murder case "reasonably should have known" his victim was a peace officer engaged in the performance of official duty. (*Rodriguez, supra,* at pp. 779, 782; see *Linwood*, *supra*, at p. 68.)

In that context, the Supreme Court stated in part that "the average juror has the ability to cull *from everyday experience* a standard by which to assess the ability of a defendant to know the status of his or her victim." (*Rodriguez*, *supra*, 42 Cal.3d at p. 782, italics added.) The *Linwood* court similarly concluded that "jurors are able to resolve the factual issue of whether a defendant reasonably should have known that a given victim was too intoxicated to resist an act of sexual intercourse." (*Linwood*, *supra*, 105 Cal.App.4th at p. 68.) We agree that jurors drawing on common experience can make this determination. We also conclude law enforcement officers and prosecutors are just as able as jurors to apply the statute's reasonableness standard, thus obviating any concern about arbitrary and discriminatory enforcement of the statute.

The familiar reasonableness standard used in section 261, subdivision (a)(3) distinguishes it from the legislation found problematic in the decisions cited by Johnson. (See *Johnson v. United States* (2015) 576 U.S. ___ [135 S.Ct. 2551, 2558] [Supreme Court's "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause [of the federal Armed Career Criminal Act] confirm its hopeless indeterminacy"]; *City of Chicago v. Morales* (1999) 527 U.S. 41, 61–63 [ordinance defining loitering as remaining in one place " 'with no apparent purpose' " provided insufficient guidance to law enforcement]; *Kolender v. Lawson* (1983) 461 U.S. 352, 358–360 [statute that had been construed to permit arrest of persons who failed to provide " 'credible and reliable' identification" did not provide sufficient standards to regulate police discretion].)

## C. The Mental State Element of the Offense of Rape of an Intoxicated Person

Johnson argues the language in section 261, subdivision (a)(3) permitting conviction when a person's intoxicated condition "reasonably should have been known" by the defendant improperly establishes a civil negligence standard for imposing criminal

liability and thus violates section 20 and due process. The *Linwood* court rejected a similar argument (*Linwood*, *supra*, 105 Cal.App.4th at pp. 70–72), and we do as well.

Section 20 states: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." Our Supreme Court has stated: "The interpretive rule embodied in this statute is by no means inflexible, public welfare offenses being the chief recognized exception. Nonetheless, at least where the penalties imposed are substantial, section 20 can fairly be said to establish a presumption against criminal liability without mental fault or negligence, rebuttable only by compelling evidence of legislative intent to dispense with mens rea entirely." (*In re Jorge M.* (2000) 23 Cal.4th 866, 879.)

Consistent with this general rule, section 261, subdivision (a)(3) includes a mens rea requirement. Conviction of rape requires proof of general criminal intent, i.e., "the perpetrator's criminal intent to commit sexual intercourse without the partner's consent." (*Linwood*, *supra*, 105 Cal.App.4th at p. 70.) Under section 261, one circumstance that makes sexual intercourse nonconsensual and therefore criminal is the victim's inability to consent due to a degree of intoxication that prevents resistance. (§ 261, subd. (a)(3); *Linwood*, *supra*, at p. 71.) The statute requires proof that the victim's condition "was known, or reasonably should have been known" by the defendant. (§ 261, subd. (a)(3); *Linwood*, *supra*, at p. 71.) As the *Linwood* court explained, this language "does not eliminate the knowledge requirement; rather, it sets a standard of knowledge or constructive knowledge." (*Linwood*, *supra*, at p. 71.)

Johnson contends, however, that the statute's articulation of the constructive knowledge standard ("reasonably should have been known") is improper because it does not track the usual description of "criminal negligence" and is more akin to a "civil negligence" standard. The *Linwood* court acknowledged that a " ' "reasonably should have known" formulation departs somewhat from the usual description of criminal negligence.' " (*Linwood*, *supra*, 105 Cal.App.4th at p. 71.) In defining the latter term, our Supreme Court has stated, " 'Criminal negligence refers to " 'a higher degree of negligence than is required to establish negligent default on a mere civil issue. The

17

negligence must be aggravated, culpable, gross, or reckless.' " ' " (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 399.)

But there is no requirement that a criminal statute must state a negligence standard using this precise language. In *Williams v. Garcetti, supra,* 5 Cal.4th at p. 573, our Supreme Court held that a statute requiring a parent to exercise "reasonable supervision and control" over his or her minor children required proof of criminal negligence. The court stated: "The duty to act 'reasonably' reflects the applicability of the negligence doctrine—here, criminal, not civil, negligence." (*Ibid.*) The court in *Linwood* similarly interpreted the reasonableness language in section 261, subdivision (a)(3) as applying "a criminal negligence standard rather than a civil negligence standard on the accused's knowledge of the victim's disabling intoxication." (*Linwood*, *supra*, 105 Cal.App.4th at p. 71.) We decline to hold that either section 20 or due process principles required the Legislature to describe the constructive knowledge standard in section 261, subdivision (a)(3) differently than it did.

## D.    Prosecutorial Misconduct

Johnson contends several acts of prosecutorial misconduct require reversal of his conviction. We disagree.

" ' " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' . . . To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." ' " (*People v. Charles* (2015) 61 Cal.4th 308, 327.)

### 1.    The Reference to an Excluded Prior Conviction

Johnson first argues the prosecutor committed misconduct by referring to Johnson's having been convicted of selling crack, in violation of an in limine ruling. The court ruled in limine that the prosecution could introduce, for impeachment, evidence of

Johnson's three most recent felony convictions, which included a 2010 conviction for sale of marijuana (Health & Saf. Code, § 11360, subd. (a)). In an earlier colloquy with counsel, the court had discussed the possibility of admitting Johnson's four most recent convictions, a ruling that would have permitted evidence of a 2006 conviction for possession of cocaine base for sale (Health & Saf. Code, § 11351.5).

During cross-examination of Johnson's sister Felecia, the prosecutor asked if Johnson had "a felony conviction for selling crack," and Felecia stated he did. Defense counsel objected, stating the conviction should have been referred to more generically, as a "sale of narcotics, sale of controlled substance." The court directed the prosecutor to rephrase the question; the prosecutor asked if Johnson had "a conviction for selling narcotics"; and Felecia responded that he did. Defense counsel later argued the question was misconduct and asked the court to give a curative instruction. Counsel also filed a motion for a mistrial based on this issue and on certain questions the prosecutor asked while cross-examining Johnson. The court denied the mistrial motion but gave a curative instruction as part of its final set of instructions, telling the jury it was "not to consider anything about" the "specific narcotic" that had been mentioned during the discussion of Johnson's prior convictions, and should consider "just merely the conviction for sale of a narcotic."

The Attorney General acknowledges that, under the in limine ruling, the prosecutor should have referred only to a conviction for sale of narcotics (or sale of marijuana). He argues, however, and we agree, that the prosecutor's error does not require reversal. The single question on this point was not a pattern of egregious conduct establishing a federal due process violation. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) And while California courts have held it is misconduct for a prosecutor to " ' " 'intentionally elicit inadmissible testimony' " ' " (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 902), the record here does not establish intentional misconduct. Since the court initially considered admitting Johnson's four most recent convictions (one of which was for possession for sale of cocaine base), the prosecutor may have mistakenly

19

believed that was one of the admitted convictions or may have conflated it with the marijuana conviction.

Finally, in our view, the court's prompt correction of the prosecutor, followed by a curative instruction on the issue, rendered any error harmless. The single improper question here contrasts with the "repeated insinuations" of prior drug dealing that the court found prejudicial in *People v. Wagner* (1975) 13 Cal.3d 612, 621 (the case on which Johnson principally relies).

### 2. Cross-Examination of Johnson

During his cross-examination of Johnson, the prosecutor asked several questions that Johnson claims amount to reversible misconduct. We disagree.

The first set of challenged questions occurred at the outset of cross-examination. The prosecutor asked, "What does it feel like exactly when a woman can't really fight back, and you're raping her?" Defense counsel objected to the question as argumentative, and the court sustained the objection and instructed the jury to disregard the question. The prosecutor then asked, "Have you ever had sex with an unconscious woman before this night?" Johnson answered, "Not in my life." The prosecutor asked, "Just this night?" Johnson replied, "No nights." Defense counsel objected; the court held a sidebar conference; and the prosecutor ceased this line of questioning.

The court correctly ruled these questions were argumentative and redirected the prosecutor. (See generally *People v. Chatman* (2006) 38 Cal.4th 344, 384.) Because the court "sustained objections to the argumentative element of the prosecutor's questioning, we assume any prejudice was abated." (*People v. Dykes* (2009) 46 Cal.4th 731, 764.) The brief exchange described above, promptly curtailed by the trial court, does not rise to the level of reversible misconduct.

The prosecutor later asked questions about whether Johnson had found Annie attractive, a line of inquiry that was relevant to establish Johnson had a motive to kidnap or rape Annie. During this questioning, the prosecutor referred to Johnson's testimony that Annie sat on his lap at a bus stop and asked, "Do you like pretty girls sitting on your lap?" Johnson expressed confusion, and defense counsel objected to the question as

20

argumentative and on relevance grounds. The court held a sidebar conference and directed the prosecutor to rephrase the question, after which he asked more general questions about whether Johnson had found Annie attractive and cool, and Johnson agreed he had. Although the court did not expressly rule that the challenged question was argumentative, the court's redirection of the prosecutor ameliorated any prejudice from the question.

Finally, at a later point in his cross-examination, the prosecutor asked Johnson, "[D]o you feel as if it would be okay if someone picked up one of your daughters or one of your sisters when they were drunk, took them to the Henry Hotel and had sex with them?" The court initially sustained a defense objection to the question as argumentative, but the prosecutor stated the question was designed to impeach Johnson based on his police interview, and the court stated it would give the prosecutor some "leeway." When Johnson stated he was unable to answer the question, the prosecutor played a segment of an audiotape of Johnson's police interview in which he stated it would not be okay for that to happen to one of his daughters or one of his sisters.

The prosecutor's question on this point was not misconduct. Johnson's admission to the police that he would find his conduct inappropriate if others had done the same thing was relevant, as it supported a conclusion he did not hold an actual mistaken belief that Annie had consented. Questioning on this subject also was relevant to impeach his credibility. (See *People v. Dykes, supra,* 46 Cal.4th at p. 764 ["When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad."].)

### 3. Closing Argument

In closing argument, after reminding the jurors they had agreed during jury selection that they would not place responsibility for rape on the raped woman, the prosecutor stated about Johnson, "And he bears a whole hell of a lot of responsibility for his disgusting and deplorable conduct." Defense counsel objected, and the court overruled the objection. The prosecutor then stated, "Rape is disgusting. And I'm going to keep calling it disgusting. He is disgusting for what he did." The prosecutor later

21

concluded his discussion of the consent element of kidnapping by calling Johnson's act "disgusting conduct."

Johnson contends the prosecutor, by making these comments, improperly sought to "demoniz[e]" him. Johnson forfeited this claim by failing to ask the trial court to admonish the jury to disregard the argument. (*People v. Charles, supra,* 61 Cal.4th at pp. 327–328.)

In any event, there was no misconduct. "Prosecutorial argument 'may include opprobrious epithets warranted by the evidence. [Citation.] Where they are so supported, we have condoned a wide range of epithets to describe the egregious nature of the defendant's conduct.' " (*People v. Garcia* (2011) 52 Cal.4th 706, 759.) The prosecutor here focused on Johnson's *conduct* as shown by the evidence, saying that conduct was "disgusting and deplorable," and saying once that Johnson was "disgusting" *because of* his conduct ("He is disgusting for what he did."). This was permissible commentary based on the evidence and does not compare to the comments criticized in *People v. Herring* (1993) 20 Cal.App.4th 1066, 1073–1075 (the case on which Johnson principally relies), where the prosecutor referred to the defendant as " 'primal man in his most basic level,' " a " 'dog in heat,' " and a " 'parasite.' "

Johnson also contends that the prosecutor, during argument, improperly denigrated defense counsel. The prosecutor, noting the evidence as to Annie's level of intoxication, argued she did not have the mental capacity to consent to go with Johnson (for purposes of the kidnapping charge), and characterized the defense argument to the contrary as "laughable." The prosecutor stated, "She may have been the most intoxicated person in San Francisco that night, and they're actually trying to say with a straight face that this woman consented." The court overruled defense objections to both statements.

The prosecutor later argued that there was overwhelming evidence of guilt and that, as a result, the defense strategy was to "attack the victim." "They say she's mistaken. She's dumb. She's lying. She's drunk. She texted him. She didn't report this quick enough. When you have no evidence in a case specifically like this, you attack this

22

poor woman." Defense counsel objected that this argument was improper "burden shifting," and the court overruled the objection.

Johnson forfeited any claim of misconduct based on the cited portions of closing argument by failing to ask the court to admonish the jury. (*People v. Charles, supra,* 61 Cal.4th at pp. 327–328.) In any event, the challenged statements did not constitute misconduct. The prosecutor criticized the persuasive force of the defense's arguments; he did not denigrate defense counsel personally. (See *id.* at pp. 328–329.)

## E.      Instruction on Failure to Explain or Deny Adverse Evidence

The trial court, over a defense objection, instructed the jury with CALCRIM No. 361, as follows: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Johnson contends the court erred by giving this instruction. We review claims of instructional error de novo. (*People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066.) CALCRIM No. 361 "applies only when a [testifying] defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117.) It is not sufficient that the defendant's testimony "conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre"; such testimony is *not* " 'the functional equivalent of no explanation at all.' " (*Ibid.*)

Here, the trial court concluded it was appropriate to give the instruction because "[t]here [were] a lot of questions that I think would be deemed adverse testimony that was raised in cross-examination, that there were answers of—there was either no answer or I don't remember or I don't want to answer that[.]" The issue is close, but we

23

conclude there were at least two exchanges during Johnson's cross-examination that warranted giving the instruction, either of which was sufficient to support its use.

First, it was abundantly clear Annie was nearly totally debilitated when she and Johnson arrived at the Henry Hotel, since he testified that, with Big Chuck's help, he had to use a walker to get her there and she was still in the walker when they reached the room. The prosecutor asked Johnson if he had intercourse with Annie very soon, or within "minutes," after they entered the room at the Henry Hotel. Johnson replied, "It wasn't minutes. It was maybe 15, 20 minutes. It could have been an hour, half hour. I'm not for sure, but I calculated it the best way I could that I know." The prosecutor played portions of the audiotape of Johnson's statement to Sergeant Yuen, in which he stated he had sex " 'maybe ten, maybe fifteen' " minutes after arriving in the hotel room. Johnson then repeated that he did not know for sure. The prosecutor asked whether Johnson's memory was more fresh at the time of the interview or several months later at the time at trial. Johnson stated, "I can't say that. I don't know."

By giving these answers (and by declining to acknowledge his memory was fresher shortly after the incident than at trial), Johnson failed to provide an explanation of the evidence that he told Sergeant Yuen he had sex shortly after entering the hotel room. Johnson "could reasonably be expected to have" knowledge of how long he was in the room before having sex and why he told Sergeant Yuen what he did about that issue. (See *People v. Cortez, supra,* 63 Cal.4th at p. 117.)

Second, the prosecutor asked Johnson if he had left Annie a voicemail, and Johnson stated he had. The prosecutor then asked: "And when you left that voice mail you said, 'Maybe I shouldn't have did what I did.' Do you remember saying that?" Johnson replied no. When the prosecutor asked whether playing the voicemail would refresh his memory, Johnson replied, "You can play it and play it over and over. I just don't remember." When the prosecutor asked, "So you may have said it," Johnson replied, "I may have said it. I may have not." The prosecutor added, "If you said maybe I shouldn't have did what I did, what is it that you did that you shouldn't have done?" Johnson replied, "I don't know." Johnson's failure to deny or explain an incriminating

24

statement that he agreed he might have made provided a basis for giving the adverse inference instruction. Johnson "could reasonably be expected to have" knowledge of what he meant when he told Annie that maybe he should not have done what he did. (See *People v. Cortez, supra,* 63 Cal.4th at p. 117.)

## F.  Admission of Prior Convictions for Impeachment

The court ruled the prosecution could introduce, for impeachment, evidence of Johnson's three most recent felony convictions, which included (1) a 2012 conviction for grand theft (§ 487, subd. (c)), (2) a 2010 conviction for sale of marijuana (Health & Saf. Code, § 11360, subd. (a)), and (3) a 2010 conviction for battery of a cohabitant (§ 273.5, subd. (a)). For each charge, the court permitted the prosecution to use "the fact of the conviction, the date of the conviction, the county and court where the conviction occurred and the actual charge." After discussion with counsel, the court ruled the battery conviction was to be described as battery of a "cohabitant," the term suggested by defense counsel. Johnson and his sisters testified Johnson had been convicted of these offenses.

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931 (*Clark*).) "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, [(1)] whether it reflects on the witness's honesty or veracity, [(2)] whether it is near or remote in time, [(3)] whether it is for the same or similar conduct as the charged offense, and [(4)] what effect its admission would have on the defendant's decision to testify." (*Ibid.*) The court did not abuse its discretion under Evidence Code section 352 in admitting the three convictions at issue here.

Addressing the above factors in his appellate brief, Johnson acknowledges the three convictions are for crimes involving moral turpitude and are not remote in time. Their admission did not deter Johnson from testifying. As to the third factor, Johnson agrees the drug and theft offenses are not similar to the charges in the present case. He

contends, however, the conviction for battery of a cohabitant was similar to the current charges and therefore prejudicial, because each case "involved a crime of violence perpetrated against a woman."

The court did not abuse its discretion on this point. While the similarity between a prior conviction and the charged offenses "is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive." (*Clark, supra,* 52 Cal.4th at p. 932.) And the court explained its conclusion that the prior battery and the current case were not as similar as Johnson contended, because the present matter was "a consent case," in which there "may have been some force, but no violence." The court elaborated: "Had the allegations been he had forced her off the street, you know, battered her in some way and then sexually assaulted her, that would be one thing," but the evidence here suggested he was "sort of taking care of her" and "putting a jacket on her." The court reasonably concluded this dissimilarity "diminishes any potential prejudice."

## G. The Failure to Instruct on the Prosecution's Failure to Disclose Evidence

### 1. Background

Annie testified on cross-examination that, on September 15, at Sergeant Yuen's direction, she resumed sending text messages to Johnson in an effort to obtain more information from him. When Sergeant Yuen testified, he confirmed he asked Annie to attempt a pretextual phone call (which Johnson did not answer) and to send pretextual text messages to Johnson. Sergeant Yuen stated this is a common investigatory technique that he uses in almost every sexual assault case. He also stated that, although he recorded his interview with Annie, he did not record his explanation to her of the investigative technique of conducting pretextual communications.

In hearings outside the jury's presence, defense counsel argued the prosecution violated its discovery obligations by failing to disclose prior to trial that some of Annie's text messages to Johnson (i.e., those sent on and after September 15) were pretextual. The prosecution did produce prior to trial the texts themselves, as well as documents showing that Annie met with Sergeant Yuen on September 15 and that the pretextual phone call was made on that date. Sergeant Yuen's written chronology of his

26

investigation referred to the pretextual phone call but did not mention that pretextual text messages were sent. The prosecutor stated he did not know prior to the testimony on this issue that the texts beginning on September 15 were pretextual, although he assumed they were since they began on the same date as the sergeant's interview of Annie and the pretextual phone call.

Defense counsel asked the court to give a late discovery instruction (CALCRIM No. 306) based on the alleged discovery violation. CALCRIM No. 306 states in relevant part: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose: _____ <describe evidence that was not disclosed> [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

During several discussions with counsel, the court offered to allow defense counsel to recall Annie or Sergeant Yuen to testify further about the pretextual nature of the text messages. The court ultimately declined, however, to give the late discovery instruction. The court emphasized that its ruling did not preclude defense counsel from "arguing anything with regard to [the discovery issue] if you wish."

### 2. Analysis

Johnson contends the court prejudicially erred by declining to instruct the jury with CALCRIM No. 306. We disagree.

"Section 1054.1 (the reciprocal-discovery statute) '. . . requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 279–280 (*Verdugo*).) Evidence subject to disclosure includes "[a]ny exculpatory evidence." (§ 1054.1, subd. (e).) " 'Absent good cause, such evidence must be disclosed at least 30

27

days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)' " (*Verdugo*, *supra*, 50 Cal.4th at p. 280.)

"Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order.' [Citation.] The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' " (*Verdugo*, *supra*, 50 Cal.4th at p. 280.) The court's ruling on discovery sanctions is reviewed under an abuse of discretion standard. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) "A violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . ." (*Verdugo*, *supra*, 50 Cal.4th at p. 280.)

Even assuming Johnson is correct that a section 1054.1 violation occurred, he has not met his burden of showing he was prejudiced by the court's refusal to give the CALCRIM No. 306 instruction. The jury knew from the testimony of Annie and Sergeant Yuen that the text messages beginning on September 15 (and the phone call on that date) were pretextual. To the extent this fact was relevant to the jurors' assessment of Annie's credibility or the prosecution's case more generally, defense counsel was free to, and did, explore it in questioning both Annie and Sergeant Yuen. As noted, the court also offered to allow counsel to recall either or both of the witnesses to address the issue more fully. Johnson does not explain what his counsel would have done differently if the pretextual nature of the texts had been disclosed earlier.

In these circumstances, we conclude it is not reasonably probable that telling the jurors the additional fact that the prosecution did not disclose the pretextual nature of the text messages prior to trial would have significantly affected their assessment of the evidence or led to Johnson's obtaining a more favorable outcome at trial. Significantly, as noted, the pretextual nature of the September 15 *phone call* was disclosed prior to trial, so even if the court had given the requested instruction about the text messages, it is not likely the jury would have inferred the prosecution was deliberately attempting to hide

28

from the defense the fact it had used routine pretextual techniques in its investigation. There was no prejudicial abuse of discretion in declining to give the instruction. The circumstances here are not similar to those presented in *People v. Zamora* (1980) 28 Cal.3d 88, 93–94, cited by Johnson, in which the court held an instruction adverse to the prosecution was a necessary sanction in light of the wholesale destruction of potentially relevant excessive-force complaints against police officers.

## H. Ineffective Assistance of Counsel

Johnson states that, if this court finds he forfeited certain of his claims (those asserting prosecutorial misconduct, instructional error, and vagueness of the rape statute), then his "alternate position" is that his trial counsel provided ineffective assistance by failing to make the necessary objections in the trial court. In our discussion above, we have not resolved any of the specified appellate claims solely on the ground of forfeiture. (As to some of the prosecutorial misconduct claims, we noted they were forfeited *and* rejected them on the merits.) We therefore need not address Johnson's backup claim of ineffective assistance.

## I. Imposition of Restitution Fine and Court Fees

At sentencing, the court imposed a $300 restitution fine (§ 1202.4, subd. (b)), a $40 court security fee (§ 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373). In supplemental briefing, Johnson contends we should reverse imposition of the court security fee and criminal conviction assessment and impose a stay of the restitution fine until the People prove he has the ability to pay such assessments. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Johnson argues the court did not make a finding as to his ability to pay and that the statutes requiring imposition of the assessments without such a finding are fundamentally unfair and violate due process. The People argue that Johnson forfeited any challenge to the imposition of the two fees and the restitution fine by failing to object on this ground in the trial court. (See *People v. Avila* (2009) 46 Cal.4th 680, 729 [finding forfeiture where the defendant failed to object to imposition of restitution fine under former § 1202.4 based on inability to pay].) We do not agree. There is a well-established exception to the forfeiture doctrine where a

29

change in the law—warranting the assertion of a particular objection, where it would have been futile to object before—was not reasonably foreseeable. (*People v. Black* (2007) 41 Cal.4th 799, 810 ["We long have applied the rule that although challenges to procedures . . . normally are forfeited unless timely raised in the trial court, 'this is not so when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change.' "].)

Can it be said that *Dueñas* was reasonably foreseeable? We think not. Granted, *Dueñas* is grounded in longstanding due process principles and precedent (see *Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168–1169, 1171 [relying on *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660]), but the statutes at issue here stood and were routinely applied for so many years without successful challenge (see *Dueñas*, *supra*, 30 Cal.App.5th at p. 1172, fn. 10), that we are hard-pressed to say its holding was predictable and should have been anticipated.[5] (*People v. Castellano* (2019) 33 Cal.App.5th 485, 488–489; but see *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.)

On the merits, however, we think *Dueñas* is distinguishable. That case involved a homeless probationer, Velia Dueñas, who suffered from cerebral palsy and was unable to work. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.) Ms. Dueñas's driver's license was suspended when she could not pay some juvenile citations as a teenager. (*Id.* at p. 1161.)

---

[5] We stop short of categorically rejecting forfeiture as a basis for resolving *Dueñas*-based challenges to fines and fees. Here, as in *Dueñas,* the restitution fine imposed on Johnson was the statutory minimum (it was $150 there, which is the misdemeanor minimum, while it is $300 here, which is the felony minimum). (See § 1202.4, subd. (b)(1).) For restitution fines *above* the statutory minimum, the statutory scheme expressly permits sentencing courts to take the defendant's ability to pay into account in setting the fine. (See §1202.4, subd. (c) ["[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)"].) The distinction between minimum and above minimum restitution fines has consequences for the applicability of forfeiture doctrine. Had the court imposed a restitution fine on Johnson above the statutory minimum, we would have come to the opposite conclusion on the issue of forfeiture, at least for purposes of that fine, since, there, it could be said that he passed on the opportunity to object for lack of ability to pay.

She was then convicted of a series of misdemeanor offenses for driving with a suspended license, and in each case was given the impossible choice whether to "pay[]" mandatory fees and fines—which she could not do, because of her poverty—or go to jail. (*Id.* at p. 1161.) After serving jail time in the first three of these cases, she still faced outstanding debt, which mounted with each conviction. (*Ibid.*)

Upon her fourth conviction for driving with a suspended license, Ms. Dueñas was placed on probation and again ordered to pay mandatory fees and fines. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1161–1162.) In an effort to put a stop to these spiraling fees and fines, Ms. Dueñas brought a due process challenge to Penal Code section 1465.8, Government Code section 70373, and Penal Code section 1202.4, the statutes under which the fees and fines were imposed. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) She argued that "[t]hese statutes . . . are fundamentally unfair because they use the criminal law, which is centrally concerned with identifying and punishing only blameworthy decisions, to punish the blameless failure to pay by a person who cannot pay because of her poverty. The laws, moreover, are irrational: They raise no money because people who cannot pay do not pay." (*Ibid.*)

A Second District, Division Seven panel agreed, concluding that due process "requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The panel also held that "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

Johnson, as a felon sentenced to prison for a lengthy term, is not similarly situated to the misdemeanor probationer in *Dueñas*. He was ordered to pay mandatory fees and a fine under the same constellation of statutes that were at issue in *Dueñas*, but there the

31

similarity ends.  At trial, he testified that he worked off and on as a painter and a municipal cleaner.  He owned and used a cell phone for texting, and quite clearly could afford the ongoing expense associated with that.  And on the night of the offense for which he was convicted, he was able to afford the unplanned expense of a hotel room.  These are hardly indications of wealth, but there is enough evidence in the trial record to conclude that the total amount involved here did not saddle Johnson with a financial burden anything like the inescapable, government-imposed debt-trap Velia Dueñas faced.

Not only does the record show Johnson had some past income-earning capacity, but going forward we know he will have the ability to earn prison wages over a sustained period.  (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's ability to obtain prison wages].)  The idea that he cannot afford to pay $370 while serving an eight-year prison sentence is unsustainable.  Thus, even if we were to assume Johnson is correct that he suffered a due process violation when the court imposed this rather modest financial burden on him without taking his ability to pay into account, we conclude that, on this record, because he has ample time to pay it from a readily available source of income while incarcerated, the error is harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

### III.  DISPOSITION

The judgment is affirmed.

_____
STREETER, J.

WE CONCUR:


_____
POLLAK, P.J.


_____
TUCHER, J.

33

A149394/*People v. Johnson*

A149394/*People v. Johnson*

Trial Court:                        City and County of San Francisco Superior Court

Trial Judge:                       Hon. Loretta M. Giorgi

Counsel:

> Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

> Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General for Plaintiff and Respondent.

35